QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Jeffery D. McFarland (Bar No. 157628)
  jeffmcfarland@quinnemanuel.com
  Shahin Rezvani (Bar No. 199614)
  shahinrezvani@quinnemanuel.com
  Aaron Perahia (Bar No. 304554)
  aaronperahia@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443 3000
Facsimile:   (213) 443 3100

Attorneys for Plaintiff Farhad Safinia

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| FARHAD SAFINIA, an individual,<br><br>                    Plaintiff,<br><br>          vs.<br><br>VOLTAGE PICTURES, LLC,  a California limited liability company; VOLTAGE PRODUCTIONS, LLC, a Nevada limited liability company; CHRISTCHURCH PRODUCTIONS DAC, an Ireland designated activity company; NICOLAS CHARTIER, an individual; and DOES 1 through 100, inclusive,<br><br>                    Defendants,<br><br>AND RELATED COUNTERCLAIMS.<br>. | Case No. 2:17-cv-06902-CBM-RAO<br>Assigned to: Hon. Consuelo B. Marshall<br><br>**FARHAD SAFINIA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Declarations of Vicki Christianson, Bruce Davey, Warren Dern, Farhad Safinia, Aaron Perahia, and Shahin Rezvani, filed under separate cover]<br><br>Date:          November 13, 2018<br>Time:         10:00 a.m.<br>Place:        First Street Courthouse<br>Room:        8B<br><br>Action Filed:  September 19, 2017<br>Trial Date:     April 30, 2019 |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................ 1

FACTS MATERIAL TO THE MOTION ................................................ 2

    A.    Mr. Safinia Revises a Pre-Existing Screenplay for Icon in 2007. ......... 2

    B.    In 2016, Voltage Asks Mr. Safinia to Perform a Rewrite. ................... 4

    C.    Mr. Safinia Creates and Copyrights His Rewrite, Which Contains His Own Significant, Original Artistic Expression. ............................... 5

    D.    Mr. Safinia and Defendants Exchange Drafts of a "Writer Employment Agreement" that Never Gets Finalized. ............................ 7

    E.    Defendants Infringe Mr. Safinia's 2016 Screenplay. ........................... 10

ARGUMENT ......................................................................................... 13

I.    THE COURT SHOULD DENY OR DEFER THE MOTION ...................... 13

II.    DEFENDANTS MISSTATE, AND FAIL TO CARRY THEIR BURDEN ............................................................................................. 14

III.    MR. SAFINIA'S SCREENPLAY IS NOT A WORK FOR HIRE ............... 15

IV.    THE 2007 CERTIFICATE OF AUTHORSHIP DOESN'T ASSIGN A COPYRIGHT TO A SCREENPLAY THAT DID NOT EXIST UNTIL 2016 .................................................................................................... 15

V.    THE 2016 SCREENPLAY IS A VALID DERIVATIVE WORK ............... 18

VI.    MR. SAFINIA DID NOT LIE TO THE COPYRIGHT OFFICE ............... 19

VII.    DEFENDANTS ARE NOT CO-AUTHORS .......................................... 20

VIII.    MR. SAFINIA DID NOT INTEND TO ALLOW DEFENDANTS TO A USE HIS SCREENPLAY WITHOUT HIS INVOLVEMENT ................ 21

IX.    MR, SAFINIA WILL PRESENT EVIDENCE PROVING COPYING ........ 24

CONCLUSION ...................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

2

## <u>Cases</u>

*ABS Entertainment, Inc. v. CBS Corp.*,
     900 F.3d 1113 (9th Cir. 2018) ............................................................ 14, 18

*Antonick v. Electronic Arts, Inc.*,
     841 F.3d 1062 (9th Cir 2016) .................................................................. 25

*Ashton-Tate Corp. v. Ross*,
     916 F.2d 516 (9th Cir. 1990) .................................................................... 20

*Asset Marketing Systems, Inc. v. Gagnon*,
     542 F.3d 748 (9th Cir. 2008) .................................................................... 23

*City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*,
     43 Cal. 4th 375 (2008) .............................................................................. 18

*Crispin v. Christian Audigier, Inc.*,
     839 F.Supp. 2d 1086 (C.D. Cal. 2011) ..................................................... 23

*Effects Associates, Inc. v. Cohen*,
     908 F.2d 555 (9th Cir. 1990) .................................................................... 22

*Entm't Research Group, Inc. v. Genesis Creative Group, Inc.*,
     122 F.3d 1211 (9th Cir. 1997) ............................................................ 14, 19

*F.B.T. Prods., LLC v. Aftermath Records*,
     621 F.3d 958 (9th Cir. 2010) .................................................................... 18

*First Nat. Mortg. Co. v. Federal Realty Inv. Trust*,
     631 F.3d 1058 (9th Cir. 2011) .................................................................. 17

*Foad Consulting Group, Inc. v. Azzalino*,
     270 F.3d 821 (9th Cir. 2001) .................................................................... 22

*Irwin v. American Interactive Media, Inc.*,
     1994 WL 394979 (C.D. Cal. Apr. 14, 1994) ............................................ 23

*Jazayeri v. Mao*,
     174 Cal. App. 4th 301 (2009) ................................................................... 17

*Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*,
     345 F.3d 1140 (9th Cir. 2003) .................................................................. 19

*Metcalf v. Bochco*,
     294 F.3d 1069 (9th Cir. 2002) .................................................................. 20

*Oracle America, Inc. v. Google Inc.*,
     2012 WL 1965778 (N.D. Cal. May 31, 2012) .......................................... 21

*Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*,
     69 Cal. 2d 33 (1968) ................................................................................. 17

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Rano v. Sipa Press, Inc.*,
   987 F.2d 580 (9th Cir. 1993)........................................................................23

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*,
   531 F.3d 962 (9th Cir. 2008)..............................................................20, 21

*Seiler v. Lucasfilm, Ltd.*,
   808 F.2d 1316 (9th Cir. 1987)....................................................................25

*Sterling v. Taylor*,
   40 Cal. 4th 757 (2007)................................................................................16

*Three Boys Music Corp. v. Bolton*,
   212 F.3d 477 (9th Cir. 2000)......................................................................24

*Tribeca Cos., LLC v. First Am. Title Ins. Co.*,
   239 Cal. App. 4th 1088 (2015)..................................................................16

*Urantia Foundation v. Maaherra*,
   114 F.3d 955 (9th Cir. 1997)......................................................................19

*Warren v. Fox Family Worldwide, Inc.*,
   328 F.3d 1136 (9th Cir. 2003)....................................................................15

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000)....................................................................23

## **Statutes**

17 U.S.C. § 101........................................................................................15, 20

17 U.S.C. § 410(c)........................................................................................14

## **Other Authorities**

1 Nimmer on Copyright § 1.01[B][3][a] (2017) ........................................15

## **Preliminary Statement**

Farhad Safinia wrote a screenplay entitled *The Professor and the Madman*. He applied for and obtained a copyright. He sues Defendants for using his screenplay to cobble together a film without his authorization or consent.

Defendants' motion suffers several fatal flaws. First, Defendants did not adequately meet and confer: they simply asked if Mr. Safinia would dismiss his complaint. They did not try to generate a joint statement of undisputed facts, which the Court ordered Mr. Safinia to generate for his cross motion. The Court should thus deny this motion, or take it off calendar.

Second, Defendants must convince the Court no reasonable jury will come to any other conclusion than no liability for infringement. But factual issues abound, and Defendants do nothing to overcome the copyright's presumptive validity.

Third, the 2016 Screenplay does not constitute a work for hire.

Fourth, the parties disagree about the Certificate of Authorship Mr. Safinia signed way back in 2007. Defendants think no parol evidence is admissible, and the Certificate covers the 2016 Screenplay. Mr. Safinia begs to differ: the Certificate is not any such assignment. At the very least, the Certificate is reasonably susceptible to more than one meaning. Under California law applied by courts in this circuit, the ultimate import is for the jury to decide.

Fifth, the 2016 Screenplay is a valid derivative work, quantitatively and qualitatively different enough from the book from which it is derived. Moreover, protecting the screenplay does not stop others from using another screenplay.

Sixth, Mr. Safinia avers he did not lie in applying for the copyright and did not intend to defraud the Copyright Office. That is enough to defeat the defense.

Seventh, Defendants are not the screenplay's co-authors: they did not pen any portion of it.

Eighth, Defendants cannot prove an implied license. That Mr. Safinia directed the Film evidences his intent not to "let go" of the screenplay and allow

-1-

Defendants to do whatever they want.  The cases on which Defendants rely do not apply: they hold a seller grants a buyer an implied license to use a product for the purpose for which the seller sold it.  Here, Mr. Safinia sold Defendants nothing.

Ninth, Mr. Safinia and Bruce Davey witnessed Defendants' use of the screenplay to shoot the Film.  Defendants' former employee who was on set admitted the same.  That is *direct evidence* of copying, and enough to prove infringement.  But, in any event, Mr. Safinia will bring a copy of Defendants' Film to trial for the jurors to see themselves.

### Facts Material to the Motion

A.   <u>Mr. Safinia Revises a Pre-Existing Screenplay for Icon in 2007.</u>

In late 2003, Mr. Safinia began working for Icon Productions, LLC ("Icon"), a production company founded by Academy Award winners Mel Gibson and Bruce Davey.  Farhad Safinia's Statement of Genuine Disputes of Material Facts ("SGD") 1; Declaration of Farhad Safinia dated October 23, 2018 ("Safinia Decl."), ¶2.  While working at Icon, Mr. Safinia co-wrote and co-produced his first feature film, *Apocalypto*, which was nominated for three Academy Awards and a Golden Globe in 2007.  SGD 2; Safinia Decl. ¶2.

Following the success of *Apocalypto*, Mr. Safinia was engaged to revise a 2001 screenplay entitled, "The Professor and the Madman," which was based on Simon Winchester's book of the same name (the "Book").  SGD 3; Safinia Decl. ¶3.  Icon had been seeking to develop a film based on the Book (the "Film"), and it held the rights to the 2001 screenplay and certain related rights.  SGD 4; Declaration of Vicki Christianson dated October 23, 2018 ("Christianson Decl.") ¶2.  At the time Mr. Safinia was engaged, he was not a Writers Guild of America ("WGA") member, but Icon was a WGA signatory; thus, Mr. Safinia was engaged by Icon's affiliate, Airborne Productions, Inc. ("Airborne"), which was not a WGA signatory.  SGD 5; Declaration of Vicki Christianson dated October 23, 2018 ("Christianson Decl.") ¶3.

In connection with Mr. Safinia's engagement, he and Airborne signed a Certificate of Authorship dated January 8, 2007 (the "COA").  SGD 6; Safinia Decl., Exh. A.  The COA provided, among other things, that Airborne engaged Mr. Safinia "to render writing services in connection with the pre-existing screenplay entitled 'The Professor and the Madman,'" and that "the results and product of all such services [. . .] will be a 'work made for hire'[.]"  SGD 7; Safinia Decl., Exh. A.

The COA limits the scope of Mr. Safinia's engagement to his writing services on the 2001 screenplay, which was the only "pre-existing screenplay" at the time:

> I, Farhad Safinia, hereby certify that I have been engaged by Airborne Productions, Inc. ("Company") to render writing services in connection with the pre-existing screenplay entitled "The Professor and the Madman" based on the book of the same name (the "Project").

SGD 8; Safinia Decl., Exh. A.

The COA then provides that any work Mr. Safinia creates *in connection with that engagement* would be deemed a work-made-for-hire and owned by Airborne:

> In connection therewith, I hereby represent, warrant and agree that (a) my services are rendered for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged; (b) the results and product of all such services, including, without limitation, all writings, notes, ideas, characters, situations, themes and plots I contribute in connection with the Project, (collectively, the "Work") are and will be deemed to have been specifically ordered or commissioned by Company for use as part of a motion picture or other audio visual work; (c) such results and product are and will be a "work made for hire" within the meaning of the United States Copyright Act; and (d) Company shall be deemed to be the author thereof and the owner of all rights therein and of all proceeds derived therefrom and in connection therewith, with the right to make such changes therein and such uses and disposition thereof, in whole or in part, as Company may from time to time determine as the author and owner thereof.

SGD 9; Safinia Decl., Exh. A.

When Mr. Safinia and Airborne signed the COA, they both contemplated and understood it would cover Mr. Safinia's engagement in 2007 to revise the 2001

screenplay.  SGD 10; Safinia Decl. ¶3; Christianson Decl. ¶3.  They did not think, much less agree, that the COA would cover future work from Mr. Safinia beyond his 2007 revision.  SGD 11; Safinia Decl. ¶3; Christianson Decl. ¶3.

After signing the COA, Mr. Safinia began revising the 2001 screenplay. SGD 12; Safinia Decl. ¶4.  It took months, and he created several drafts along the way, but Mr. Safinia had finished the 2007 revision by the time he left Icon in 2009. SGD 13; Safinia Decl. ¶4.  At that time, Mr. Safinia and Airborne understood that Mr. Safinia's engagement under the COA had terminated, that Airborne owned the 2007 revision and drafts created up to that time, and that the COA would not cover any of Mr. Safinia's future work.  SGD 14; Safinia Decl. ¶4; Christianson Decl. ¶4.

Mr. Safinia went on to work on numerous other projects after leaving Icon. SGD 15; Safinia Decl. ¶5.  For instance, from 2010 to 2012, Mr. Safinia created, wrote, and executive produced the television series *Boss*, which was nominated for a Golden Globe.  SGD 16; Safinia Decl. ¶5.  Meanwhile, Icon spent the next few years exploring options to develop the Film.  SGD 17; Declaration of Bruce Davey dated October 23, 2018 ("Davey Decl.") ¶2.

B.   In 2016, Voltage Asks Mr. Safinia to Perform a Rewrite.

Around 2014, Voltage expressed interest in producing the Film.  ECF No. 129-2 (Declaration of Nicolas Chartier filed October 16, 2018 ("Chartier Decl.")), ¶3.  Icon sent Voltage a copy of the most recent screenplay, dated January 25, 2015, and they later entered into a co-production agreement in March 2015.  ECF No. 129-5 (Declaration of Ryan D. Austin filed October 16, 2018 ("Austin Decl."), Exh. D (1/25/15 Screenplay) , Exh. F (Deal Memorandum).  The agreement specified, among other things, that Mr. Safinia would direct the Film, and that Voltage would enter a directing agreement with him.  Austin Decl., Exh. F ¶B-1.  Thereafter, Icon and Voltage began working on various pre-production matters.  Chartier Decl. ¶5.

By summer 2016, however, Voltage had concerns the Film would be too long based on then-existing screenplay.  SGD 18; Safinia Decl. ¶6 & Exh. B (7/27/16

Foreman e-mail).  So, in July 2016, Voltage asked Mr. Safinia to rewrite the screenplay.  SGD 19; Safinia Decl. ¶6.  Among other things, Voltage requested Mr. Safinia to make the rewrite shorter, so that the Film could be shot in 40 days instead of the 50 days needed for the then-existing screenplay.  SGD 20; Safinia Decl. ¶6 & Exh. B.  When Voltage made its request, it knew Mr. Safinia was not an employee of Voltage or Icon.  SGD 21; Perahia Decl., Exh. A (Transcript of the Deposition of Dominic Rustam taken June 27, 2018 – "Rustam Tr."), at 34:1-10.  Mr. Safinia set about working on it with the understanding Voltage would negotiate in good faith an acceptable agreement and fee for his rewrite.  SGD 22; Safinia Decl. ¶6.[1]

At the time of Voltage's request, Icon and Airborne still held the underlying rights related to the Film.  SGD 24; Christianson Decl. ¶5.  Thus, before making its request to Mr. Safinia, Voltage apprised Icon and Airborne of its intent to request Mr. Safinia to perform the rewrite, and they did not object.  SGD 25; Christianson Decl. ¶5; *see also* Safinia Decl. ¶6.  Months later, Airborne transferred all rights it owned related to the Film to Definition Films, an affiliate of Defendants, pursuant to a Quitclaim Agreement signed September 29, 2018.  Austin Decl., Exh. P.  Because Airborne could not transfer any rights it did not own, the Quitclaim Agreement did not transfer the rights to Mr. Safinia's work on 2016 rewrite.  SGD 26; Christianson Decl. ¶6.

    C. <u>Mr. Safinia Creates and Copyrights His Rewrite, Which Contains</u>
      <u>His Own Significant, Original Artistic Expression.</u>

Mr. Safinia finished creating the requested rewrite on September 14, 2016 (the "2016 Screenplay").  SGD 27; Safinia Decl. ¶7.  The 2016 Screenplay differs substantially from the Book and prior screenplays.  SGD 28; Safinia Decl. ¶¶8-11; *compare* Perahia Decl., Exh. D, *with* Austin Decl., Exh. L.  Among other things, Mr.

---

[1] By that time, Mr. Safinia had become a WGA member, so any agreement with him for his writing services had to comply with the WGA rules.  *See* SGD 23; Dern Decl., Exh. C at 2; Christianson Decl. ¶5.

Safinia eliminated a number of speaking and non-speaking character roles in the 2016 Screenplay.  SGD 29; Safinia Decl. ¶8.  For some of those character roles, Mr. Safinia merged multiple roles into one, while for others, he eliminated the roles altogether.  SGD 30; Safinia Decl. ¶8.  In doing so, Mr. Safinia also changed some character roles to fill the void left by character roles he eliminated.  SGD 31; Safinia Decl. ¶8.  For example, Mr. Safinia eliminated pivotal dialogue and actions of the character Annett, which appeared in the prior screenplays.  SGD 32; Safinia Decl. ¶8.  In his 2016 Screenplay, Mr. Safinia repurposed and reimagined that dialogue and those actions as being spoken and performed by the character Coleman.  SGD 33; Safinia Decl. ¶8.  The character Coleman is critical to the script because his actions ultimately bring the storyline about the professor (played by Mr. Gibson) and the storyline about the madman (played by Sean Penn) to collide against each other, and set the entire final act of the Film.  SGD 34; Safinia Decl. ¶8.

Mr. Safinia also removed certain scenes and changed other scenes to fill in the gaps.  SGD 35; Safinia Decl. ¶9.  As one example, Mr. Safinia eliminated a scene set in the chapel of Mill Hill School, thus eliminating hundreds of extras and a major shooting location, which, in the prior screenplays, also served as the audience's first introduction to the Film's main character, professor James Murray.  SGD 36; Safinia Decl. ¶9.  In another instance, Mr. Safinia changed the setting and location of a scene in which Mr. Murray, who is the central character of the Film, is interviewed from Christchurch College to the Bodleian Library.  SGD 37; Safinia Decl. ¶9.  Mr. Safinia specifically changed that scene so that the setting felt more imposing and terrifying for an interview.  SGD 38; Safinia Decl. ¶9.

In addition to reducing the number of character roles and scenes, Mr. Safinia changed the dialogue by eliminating and altering it.  SGD 39; Safinia Decl. ¶10.  Mr. Safinia also changed the dialogue by contemporizing its style, and changing its rhythm of delivery.  SGD 40; Safinia Decl. ¶10.  Examples of Mr. Safinia contemporizing the dialogue include his selective addition of contractions to certain

spoken lines, as well as his rephrasing of particular dialogue so that it was better understood by a modern audience.  SGD 41; Safinia Decl. ¶10.

The differences in the 2016 Screenplay are reflected not only by different words, scenes, and characters, but also by different transitions, and by different punctuation.  SGD 42; Safinia Decl. ¶11.  By deleting a blank line between two lines of text, for example, Mr. Safinia changed the way the Film transitions from one scene to the next.  SGD 43; Safinia Decl. ¶11.  And, by replacing a semicolon with a period, for instance, Mr. Safinia changed the way in which the line of dialogue is delivered when spoken aloud.  SGD 44; Safinia Decl. ¶11.

Mr. Safinia applied to the Copyright Office for registration of the 2016 Screenplay, and the registration, No. PAu003847498, was granted on August 4, 2017.  SGD 45; Safinia Decl. ¶12.  Mr. Safinia registered the 2016 Screenplay in good faith and with no intent to mislead.  SGD 46; Safinia Decl. ¶12.  Thus, his application and registration states his copyright does not extend to textual material contained in the work that he does not own.  SGD 47; Safinia Decl. ¶12 & Exh. C.

D.    Mr. Safinia and Defendants Exchange Drafts of a "Writer Employment Agreement" that Never Gets Finalized.

Defendants began attempting to execute agreements with Mr. Safinia for his 2016 Screenplay and his services directing the film before principal photography started on September 30, 2016.  SGD 48; Declaration of Warren D. Dern dated October 23, 2018 ("Dern Decl.") ¶3.  Zev Foreman, then-President of Production for Voltage Pictures, negotiated with Mr. Safinia's agent, Danny Greenberg, and his transactional attorney, Warren Dern, regarding the terms of the writing and directing agreements.  SGD 49; Dern Decl. ¶3.

Mr. Foreman asked Messrs. Greenberg and Dern if Mr. Safinia would participate in a fraud on the Republic of Ireland.  Mr. Foreman suggested Voltage or Christchurch would pay Mr. Safinia $1.3 million for his writing and directing services, thereby allowing Voltage, Christchurch, or one of their affiliated single-

purpose entities to claim an inflated, fraudulent tax credit from the Republic of Ireland in connection with the Film's shooting there.  SGD 50; Dern Decl. ¶3.  Mr. Foreman went on to say that, thereafter, Mr. Safinia would be expected to purchase the rights to a literary property from Voltage in the amount of $1 million, thereby keeping $300,000, and returning the $1 million to Voltage.  SGD 51; Dern Decl. ¶3.  Mr. Foreman also indicated he had perpetrated similar fraudulent transactions in connection with Voltage's production of films in the State of Louisiana to obtain tax credits there.  SGD 52; Dern Decl. ¶3.  Alarmed by the indecent proposal, Mr. Dern told Mr. Foreman that if Mr. Foreman obtained a legal opinion from a nationally recognized law firm that inflating costs to obtain tax credits in such a manner was not unlawful, he would read the opinion letter.  SGD 53; Dern Decl. ¶3.  Mr. Foreman never provided any such letter.  SGD 54; Dern Decl. ¶3.

Draft budgets for the Film generated on or about the time of Mr. Foreman's indecent proposal corroborate the fact the proposal was made.  SGD 55; Christianson Decl., Exh. A (8/11/16 Budget) at 3, 6; *id.*, Exh. B (8/19/16 Budget) at 3, 6.  Moreover, Voltage and Christchurch pitched a similar inflated Producer Fee tax scheme to Ms. Christianson and Icon around the same time – which indecent proposal Icon and Ms. Christianson rejected.  SGD 56; Christianson Decl. ¶7.

On September 23 and 28, 2016, Defendants' transactional attorneys provided drafts of a "Writer Employment Agreement" and a "Director Agreement" to Mr. Dern.  SGD 57; Dern Decl., Exh. A.  The draft "Writer Employment Agreement" reflects that Defendants were trying to acquire the rights to Mr. Safinia's 2016 Screenplay.  SGD 58; Dern Decl., Exh. A.  Among other things, Paragraph 4(a) includes a proposed work-for-hire provision, which in relevant part states:

> All results and proceeds […] of the services […] to be rendered by Writer in connection with the Picture, including ideas, suggestions, themes, plots, stories, characterizations, dialogue, titles and other material, […] created or contributed by Writer which in any way relate to the Picture or to the material on which the Picture will be based

> (collectively, "Material"), are and shall be deemed to be works made for hire for Producer.  Accordingly, Producer is and shall be considered the author and, at all stages of completion, the sole and exclusive owner the Material and all right, title and interest therein ("Rights").  The Rights shall include without limitation all copyrights […] and any and all other ownership and exploitation rights in the Material now or hereafter recognized[.]

SGD 59; Dern Decl., Exh. A ¶4.  With a belt-and-suspenders approach, Paragraph 4(a) goes on to include a proposed assignment, too, which in relevant part states:

> If under any applicable law the fact that the Material is a work made for hire is not effective to place authorship and ownership of the Material and the Picture and all rights therein in Producer, then […] Writer hereby assigns and transfers to Producer the Rights and in connection therewith, any and all right, title and interest of Writer in the Picture and any other works now or hereafter created containing the Material.

SGD 60; Dern Decl., Exh. A ¶4.

On October 4, 2016, Mr. Dern's office sent markups of the agreements back to Defendants.  SGD 61; Dern Decl., Exh. B.  As reflected in the markups to the draft "Writer Employee Agreement," Defendants and Mr. Safinia were still wrestling over Mr. Safinia's writing and directing fee, with Mr. Safinia asking for an all-in fee of $275,000.  SGD 62; Dern Decl., Exh. B at 3.  The draft agreement also reflects that, as of October 4, 2016, Defendants were still trying to acquire the rights to Mr. Safinia's 2016 Screenplay.  SGD 63; Dern Decl., Exh. B at 3-4.  Not only does that draft contain the same proposed work-for-hire and assignment provisions as the prior drafts, but handwritten marginalia next to those provisions makes clear the proposed terms have no effect until a final agreement is executed.  SGD 64; Dern Decl., Exh. B at 3.  Other marginalia nearby also reiterates that point: "***For clarity, Producer currently has no rights in current screenplay***."  SGD 65; Dern Decl., Exh. B at 3 (emphasis added).

1    Further drafts were exchanged on October 6 and 17, 2016.  SGD 66; Dern

2    Decl., Exh. C.  Those drafts have the same work-for-hire and assignment provisions

3    proposed in the prior drafts.  SGD 67; Dern Decl., Exh. C.  Moreover, in the

4    October 17 draft sent back to Defendants, Mr. Dern's office again included

5    marginalia next to those provisions clarifying that Defendants "currently ha[ve] no

6    rights in the current screenplay" and that the proposed terms have no effect until a

7    final agreement is executed.  SGD 68; Dern Decl., Exh. C at 4.  After Mr. Dern's

8    office sent the October 17 draft, Defendants did not send back any further drafts, nor

9    did they make any further efforts to finalize and sign an agreement with Mr. Safinia.

10   SGD 69; Dern Decl. ¶5.  Still, Mr. Dern continued to remind Defendants thereafter

11   "that the fruits of [Mr. Safinia's] labor remain his sole and exclusive property until

12   such time as they are transferred."  SGD 70; Dern Decl., Exh. D.

13          E.    Defendants Infringe Mr. Safinia's 2016 Screenplay.

14   In September 2016, as the terms of Mr. Safinia's writer agreement were being

15   negotiated, Mr. Safinia provided Defendants with the 2016 Screenplay.  SGD 71;

16   Safinia Decl. ¶13.  Mr. Safinia did so on the condition that Defendants would timely

17   finalize and sign an acceptable written agreement with him for his 2016 Screenplay,

18   and that absent such an agreement, Defendants would have no right in or license to

19   the 2016 Screenplay.  SGD 72; Safinia Decl. ¶13.  Despite that condition, and

20   despite having no such finalized and signed agreement with Mr. Safinia, Defendants

21   still chose to proceed with principal photography on September 30, 2016.  SGD 73;

22   Safinia Decl. ¶13.

23   As the Film's director, Mr. Safinia shot the Film using the expression in his

24   2016 Screenplay, and the scenes he shot stayed faithful to that expression.  SGD 74;

25   Safinia Decl. ¶14; Davey Decl. ¶3; *see also* Perahia Decl., Exh. A (Rustam Tr.) at

26   39:9-40:10, Exh. B (Transcript of the Deposition of Zev Foreman taken June 26,

27

28

2018 – "Foreman Tr."), at 74:2-75:4.[2]  Over the course of shooting, however, the relationship broke down.  Among other issues was Defendants' failure to conclude and execute written agreements with Mr. Safinia for his writing and directing services.  SGD 77; Safinia Decl. ¶15.  Mr. Safinia, his agent Mr. Greenberg, and his attorney Mr. Dern, repeatedly complained throughout the course of shooting about not having deals signed to Mr. Foreman, and to Defendant Nicholas Chartier. SGD 78; Safinia Decl. ¶15; ECF No. 32 (Declaration of Danny Greenberg filed November 14, 2018 ("Greenberg Decl.") ¶3; Dern Decl. ¶6.

As confirmed by Peter McAleese, the Film's executive producer, Mr. Safinia's contract was still being negotiated through mid-December 2016, and there were multiple deal points, including Mr. Safinia's writing and directing fee and the rights to his work, which had not been agreed upon.  SGD 79; ECF No. 34 (Declaration of Peter McAleese filed November 24, 2017) ¶10.  Even so, on November 21, 2016, Defendants sent two unsolicited and undisclosed wire transfers totaling $181,781.80 to an account belonging to William Morris Endeavor Entertainment, LLC ("WME").  SGD 80; Chartier Decl., Exh. A, Exh. B; Greenberg Decl. ¶3.  Because Mr. Safinia and Defendants still had not concluded and executed a contract for his writing services – much less agreed on an amount – Mr. Safinia immediately directed WME to wire the funds back to Defendants upon learning of them.  SGD 81; Safinia Decl. ¶15; *see also* Greenberg Decl. ¶3.  WME wired the funds back; they were never paid to Mr. Safinia.  SGD 82; Greenberg Decl. ¶3.[3]

---

[2]  On September 30, 2016, the 2016 Screenplay was used to create the final shooting screenplay for the Film.  SGD 75; Safinia Decl. ¶ 14.  Aside from the cover pages, the 2016 Screenplay and the shooting screenplay are identical.  SGD 76; Safinia Decl. ¶ 14; *see also* Perahia Decl., Exh. B (Foreman Tr.) at 74:2-75:4.

[3]  As for the expenses Defendants claim to have reimbursed Mr. Safinia, they are incorrect.  For example, Mr. Safinia never had his own trailer on set, so the $3,070 was not incurred, and the $4,649 Mr. Safinia received in "per diem" reimbursements was spread out over the 16 weeks he was in Ireland before and during the Film's shooting – *i.e.*, a little more $50 per work day.  SGD 83; Safinia Decl. ¶ 15.

In the end, Defendants never bothered to close and sign writing and directing deals with Mr. Safinia; instead, they decided to complete their version of the Film without him.  SGD 84; Safinia Decl. ¶¶15, 16; Perahia Decl., Exh. A (Rustam Tr.) at 76:19-23.  They took the existing footage and pieced it together themselves to complete their version, which copies the 2016 Screenplay without Mr. Safinia's consent.  SGD 85; Perahia Decl., Exh. A (Rustam Tr.) at 77:25-78:3, Exh. C (Transcript of the Deposition of Nicolas Chartier taken August 17, 2018 – "Chartier Tr."), at 138:3-7; Davey Decl. ¶4.

But Defendants didn't stop there.  They screened a portion of the Film at the Cannes Film Festival in May 2017, and the Toronto Film Festival in September 2017.  SGD 86; Safinia Decl. ¶16.  They also brought it stateside, exhibiting it for individuals at United Talent Agency and Creative Artists Agency, both located in Los Angeles, California, during June and July of 2017 for the purpose of soliciting the sale or distribution of their version to movie theaters in the United States.  SGD 87; Safinia Decl. ¶16.  Earlier this year, they went back to Cannes and screened the Film for buyers again, as well as showing it to at least one member of the selection committee for the festival.  SGD 88; Perahia Decl., Exh. A (Rustam Tr.) at 129:13-21, Exh. C (Chartier Tr.) at 136:7-10.  All told, Defendants have shown the Film to around 1,000 potential buyers, and have entered into agreements with distributors to deliver the Film by the end of this year.  SGD 89; ECF No. 12-1 (Declaration of Nicolas Chartier filed September 21, 2017) ¶30 (averring to "contractual delivery deadlines with distributors"); Perahia Decl., Exh. C (Chartier Tr.) at 136:7-10.

Defendants did all this, too, without Mr. Safinia's authorization, permission, or consent.  SGD 90; Safinia Decl. ¶16.  Mr. Safinia did what anyone in his position would: he asked Defendants to stop.  SGD 91; ECF No. 6-4, Exh. A.  They refused.  SGD 92; EXF No. 6-4, Exh. B.  Mr. Safinia thus filed this action on September 17, 2017 to protect his rights.  SGD 93; ECF No. 1 (Complaint).

1    But even after Mr. Safinia filed this action, Defendants continued to infringe

2  the 2016 Screenplay without regard for Mr. Safinia's rights.  They have raised

3  bogus defenses and engaged in bad faith litigation tactics in an effort to wage a war

4  of attrition against Mr. Safinia.[4]  Mr. Chartier even said during his deposition in this

5  action that he hopes the cost of bringing this litigation bankrupts Mr. Safinia.

6  SGD 96; Perahia Decl., Exh. C (Chartier Tr.) at 105:9-17.

7                               **Argument**

8  I.      THE COURT SHOULD DENY OR DEFER THE MOTION

9          Counsel for Defendants spoke about their instant motion twice: once on

10  October 9, and again on October 12.   Declaration of Shahin Rezvani dated October

11  23, 2018 ¶2.  They did not mention any facts or evidence supporting their intended

12  motion.  *Id.*  They did not ask if Mr. Safinia would stipulate to any undisputed facts,

13  either.  *Id.*  They simply asked if Mr. Safinia would dismiss his Complaint.  *Id.*

14          On October 22, 2018, the Court issued an order stating, "If Plaintiff files a

15  summary judgment motion, the parties are ordered to discuss and prepare during the

16  meet and confer a joint statement of undisputed facts."  ECF No. 132.  Defendants

17  didn't do that, much less fulfill their obligation under Local Rule 7-3.  Local Rule

18  7-3 provides, in part: "Conference of Counsel Prior to Filing of Motions. In all cases

19  not listed as exempt in L.R. 16-12, and except in connection with discovery motions

20

---

21      [4]   Defendants have claimed, for example, the 2016 Screenplay was a work for

22  hire, despite never employing Mr. Safinia and despite there being no writing signed
    by Mr. Safinia, on one hand, and Defendants, on the other, wherein they agree the

23  2016 Screenplay is a work for hire.  SGD 94; Safinia Decl. ¶ 17.  They have also
    claimed they have an implied license to use the 2016 Screenplay, despite offering no

24  evidence from which to glean the scope of such a purported license, and despite Mr.
    Safinia's averments he would not have licensed the 2016 Screenplay for a film that

25  was not shot, in part, at Oxford University, or for which he did not play a part in the
    final assemblage.  SGD 95; Safinia Decl. ¶ 17.  Defendants have even claimed that

26  Mr. Safinia cannot prove infringement because he does not have a copy of their
    version of the Film, and he did not request it in discovery; yet Mr. Safinia did in fact

27  request Defendants produce the Film in discovery, and they refused.  SGD 95;
    Perahia Decl., Exh. E (Voltage's RFP Resps.).

28

1  (which are governed by L.R. 37-1 through 37-4) and applications for temporary

2  restraining orders or preliminary injunctions, counsel contemplating the filing of any

3  motion shall first contact opposing counsel to discuss thoroughly, preferably in

4  person, the substance of the contemplated motion and any potential resolution."

5      As Defendants failed to meet and confer completely on all of the bases upon

6  which they move at least seven (7) days prior to filing their motion, and made no

7  effort to set forth the facts they believe were undisputed – much less meet and

8  confer on a joint statement of undisputed facts, Mr. Safinia submits the Court should

9  take Defendants' motion off calendar until the parties have met and conferred on a

10  joint statement of undisputed facts.

11  II.     DEFENDANTS MISSTATE, AND FAIL TO CARRY THEIR BURDEN

12      Defendants must prove the absence of genuine issues of material fact to win

13  this motion. *ABS Entertainment, Inc. v. CBS Corp.*, 900 F.3d 1113, 1122 (9th Cir.

14  2018).  "A genuine issue of material fact exists if, drawing all inferences in favor of

15  the non-moving party, a reasonable jury could find in favor of the non-moving

16  party." *Id.*  "Whether a work is protected by copyright law is a mixed question of

17  law and fact, which we review de novo." *Id.*

18      Moreover, "the registration of a copyright certificate constitutes prima facie

19  evidence of the validity of a copyright in a judicial proceeding commenced within

20  five years of the copyright's first publication." *Entm't Research Group, Inc. v.*

21  *Genesis Creative Group, Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997) (citing 17 U.S.C.

22  § 410(c) (1997)) (other citations omitted).  Mr. Safinia was issued a copyright for

23  his 2016 Screenplay on August 4, 2017.  SGD 45; Safinia Decl., Exh. C.  This

24  action was filed on September 19, 2017.  SGD 93; ECF No. 1 (Complaint).  Thus,

25  Mr. Safinia has "shift[ed] to the defendant the burden to prove the invalidity of the

26  ... copyright[.]" *Entm't Research Group, Inc*., 122 F.3d at 1217(quotation marks and

27  citations omitted).

28

III.   <u>MR. SAFINIA'S SCREENPLAY IS NOT A WORK FOR HIRE</u>

Section 101 of the 1976 Copyright Act provides, in part:

A "work made for hire" is—

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. [….]

17 U.S.C. § 101. Here, Mr. Safinia was never an employee of Defendants. SGD 94; Safinia Decl. ¶17. Moreover, there is not a single piece of paper signed by Mr. Safinia, on the one hand, and Defendants, on the other, where "parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." SGD 95; Safinia Decl. ¶17; *see also generally* Chartier Decl., Exhs. A, B; Austin Decl., Exhs. A-Q.

IV.   <u>THE 2007 CERTIFICATE OF AUTHORSHIP DOESN'T ASSIGN A</u>
      <u>COPYRIGHT TO A SCREENPLAY THAT DID NOT EXIST UNTIL 2016</u>

Defendants collaterally attack the copyright by asserting the 2016 Screenplay is a work for hire covered by the COA. But contrary to Defendants' assertion, the COA – signed a decade ago – does *not* include an assignment of the 2016 Screenplay, as well-settled rules of contract interpretation confirm. California law governs the COA's interpretation. *Warren v. Fox Family Worldwide, Inc*., 328 F.3d 1136, 1142 (9th Cir. 2003) (applying California law to interpret work-for-hire agreement); 1 Nimmer on Copyright § 1.01[B][3][a] (2017) ("vast bulk of copyright contractual issues must be resolved under state law"). Under California law, the Court must interpret the COA to give effect to the parties' objective intent at the time they contracted, which is discerned from the contract's plain words and the

parties' conduct after the contract's formation.  *Tribeca Cos., LLC v. First Am. Title Ins. Co.*, 239 Cal. App. 4th 1088, 1111 (2015).

Here, the COA's plain text shows it only covers work "*specifically ordered or commissioned* by [the] Company."  SGD 9; Safinia Decl., Exh. A (COA) ¶1 (emphasis added).  The COA defines the term "Company" as "Airborne Productions, Inc."  SGD 9; Safinia Decl., Exh. A (COA) ¶1.  Therefore, the COA applies only to work "specifically order or commissioned" by Airborne.  The 2016 Screenplay, however, was *not* specifically ordered or commissioned by Airborne: Voltage asked Mr. Safinia to prepare it.  SGD 9, 19; Safinia Decl. ¶6 & Exh. B.  Moreover, at the time Voltage asked Mr. Safinia to write the 2016 Screenplay, Airborne had not quitclaimed or assigned anything to Voltage or any third party.  The effective dates on the quitclaim and assignments are in September 2016.  Austin Decl., Exh. P.  Mr. Safinia completed the 2016 Screenplay before then.  Thus, the COA does not cover the 2016 Screenplay.  Austin Decl., Exh. P; *cf.* 17 U.S.C. § 101(2) (stating work-made-for-hire must be "specially ordered or commissioned" by person with whom agreement is made).

Moreover, Defendants' "practical construction" of the COA – "before any controversy [arose] as to its meaning" – demonstrates Mr. Safinia's 2016 Screenplay is not covered by the COA.  *See Sterling v. Taylor*, 40 Cal. 4th 757, 772-73 (2007) (explaining parties' pre-dispute construction "affords one of the most reliable means of determining the [parties'] intent").  Up until this lawsuit, Defendants understood the COA does not cover the 2016 Screenplay.  For example, in the unconcluded negotiations between Mr. Safinia and Defendants for a writer agreement, they sent Mr. Safinia a proposed agreement which included a provision to extinguish Mr. Safinia's rights in any work done at Defendants' behest.  SGD 59, 60; Dern Decl., Exh. A.  Among other things, the proposed agreement expressly provided that Mr. Safinia's work would "be deemed to be works made for hire" for Defendants, who would "be considered the author and . . . sole and exclusive owner of the Material,"

1  and that Mr. Safinia would transfer all rights he had in the 2016 Screenplay to

2  Defendants.  SGD 59, 60; Dern Decl., Exh. A at 3-4.  Defendants would not have

3  included such provisions if they believed Mr. Safinia did not own the 2016

4  Screenplay.  And ultimately, Mr. Safinia did not enter any such agreement with

5  Defendants: if he had, they would have attached it to the Chartier Declaration, but

6  they didn't.  *See generally* Chartier Decl.

7         The parties' later correspondence also confirms Mr. Safinia owns the 2016

8  Screenplay.  During further negotiations in October 2016, Mr. Safinia's counsel

9  made clear Defendants would not have any rights to the 2016 Screenplay until an

10  agreement was concluded.  SGD 64, 65, 68; Dern Decl., Exhs. B & C.  Moreover, in

11  May 2017, Mr. Safinia's counsel again reminded Defendants "that the fruits of [Mr.

12  Safinia's] labor remain his sole and exclusive property until such time as they are

13  transferred."  SGD 70; Dern Decl., Exh. D.  Defendants never objected to those

14  statements at the time they were made, and they cannot do so now.  *See Jazayeri v.*

15  *Mao*, 174 Cal. App. 4th 301, 325 (2009) (failure to object constitutes adoptive

16  admission).

17         Defendants argue the Court cannot consider the foregoing parol evidence

18  because the COA is not reasonably susceptible to more than one interpretation.

19  Mem. at 18-19.  However, "the fact that the terms of an instrument appear clear to a

20  judge does not preclude the possibility that the parties chose the language of the

21  instrument to express different terms."  *Pac. Gas & Elec. Co. v. G. W. Thomas*

22  *Drayage & Rigging Co.*, 69 Cal. 2d 33, 39 (1968).  Rather, "[t]he test of

23  admissibility of extrinsic evidence to explain the meaning of a written instrument is

24  not whether it appears to the court to be plain and unambiguous on its face, but

25  whether the offered evidence is relevant to prove a meaning to which the language

26  of the instrument is reasonably susceptible."  *First Nat. Mortg. Co. v. Federal Realty*

27  *Inv. Trust*, 631 F.3d 1058, 1066-67 (9th Cir. 2011).  "If in light of the extrinsic

28  evidence the court decides the language is 'reasonably susceptible' to the

1  interpretation urged, the extrinsic evidence is then admitted to aid in the second

2  step—interpreting the contract." *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d

3  958, 963 (9th Cir. 2010).  The language of the COA and the extrinsic evidence set

4  forth above establish the COA is susceptible to more than one interpretation.  And,

5  to the extent the Court finds a conflict in the extrinsic evidence and the conflict

6  raises issues of credibility, the Court should not grant summary judgment, but rather

7  let the jury decide.  *City of Hope Nat'l Med. Ctr. v. Genentech, Inc*., 43 Cal. 4th 375,

8  395 (2008) ("[T]he jury may interpret an agreement when construction turns on the

9  credibility of extrinsic evidence.").  Thus, even if the Court does not rule Mr.

10  Safinia's interpretation of the COA controls, it should not grant summary judgment,

11  but instead let the jury decide what the COA means.

12  **V.    THE 2016 SCREENPLAY IS A VALID DERIVATIVE WORK**

13         A derivative work is copyrightable if: (1) the original aspects of the derivative

14  work are more than trivial, and (2) the original aspects of the work reflect the degree

15  to which it relies on preexisting material and do not in any way affect the scope of

16  any copyright protection in that preexisting material.  *ABS Entertainment, Inc.*, 900

17  F.3d at 1122.  The first prong compares the derivative work to the work on which it

18  based.  The second looks to see the author of the derivative work may hold up others

19  from creating derivative works on their own.

20         Here, the 2016 Screenplay is based on the Book.  The Book is over 242

21  single-spaced pages in paperback form; Mr. Safinia's screenplay is only 126 pages.

22  SGD 32; *compare* Perahia Decl., Exh. D, *with* Austin Decl., Exh. L.  But not only is

23  Mr. Safinia's screenplay shorter, it includes different scenes, different dialogue, and

24  a different collection of characters.  SGD 32; *compare* Perahia Decl., Exh. D, *with*

25  Austin Decl., Exh. L.

26         Comparing the 2016 Screenplay to prior versions by John Boorman and/or

27  Todd Kormarnicki isn't the proper analysis, since Defendants present no proof any

28  of those screenplays have been registered for copyright, or that Messrs. Boorman

1   and Kormarnicki ever asserted any such rights.  But even if the comparison is

2   proper, Mr. Safinia contributed more than a trivial amount of original aspects by

3   changing specific lines of dialogue, deleting scenes, and reducing the number of

4   characters with speaking roles.  SGD 28-44; Safinia Decl. ¶¶8-11; *also compare*

5   Perahia Decl., Exh. D, *with* Austin Decl., Exh. L.  What he did is qualitatively

6   different than simply rendering a two-dimensional character design into a three-

7   dimensional costume, so the case Defendants cite, *Entm't Research Grp., Inc. v.*

8   *Genesis Creative Grp., Inc*., 122 F.3d 1211 (9th Cir. 1997), simply doesn't apply

9   here.

10         Second, the 2016 Screenplay does not abridge Mr. Winchester's rights in the

11   Book, nor does it stop anyone else from preparing a movie based on the Book.

12   Defendants can simply use one of the older versions of the screenplay written by

13   Messrs. Boorman or Kormarnicki.  Or they may, further still, write a screenplay

14   themselves, or have someone else write a screenplay, and shoot a film with it.

15   VI.   <u>MR. SAFINIA DID NOT LIE TO THE COPYRIGHT OFFICE</u>

16         In this Circuit, inadvertent mistakes on registration certificates do not

17   invalidate a copyright and thus do not bar infringement actions, unless the claimant

18   intended to defraud the Copyright Office by making the misstatement.  *Urantia*

19   *Foundation v. Maaherra*, 114 F.3d 955, 963 (9th Cir. 1997); *Lamps Plus, Inc. v.*

20   *Seattle Lighting Fixture Co*., 345 F.3d 1140, 1145 (9th Cir. 2003).  An averment by

21   the plaintiff that it did not intend to defraud the Copyright Office is sufficient to

22   preclude summary judgment.  *Lamps Plus*, 345 F.3d at 1145.

23         Here, Mr. Safinia avers he had no intent to defraud the Copyright Office.

24   SGD 46; Safinia Decl. ¶12.  That is enough to preclude summary judgment.

25   Moreover, there is nothing constituting a misstatement on the Copyright

26   Registration.  For the reasons mentioned, *see infra*, Mr. Safinia is the author of the

27   2016 Screenplay and there are no co-authors.  Further, at the time of the registration,

28   the only other copyright registration preceding Mr. Safinia's of which he was aware

1  was the one for the Book.  But as Defendants concede, he properly identified the

2  Book in his copyright registration.  Neither Mr. Boorman nor Mr. Kormarnicki

3  registered their screenplays with the Copyright Office.  Nor did Mr. Safinia ever

4  speak to or work with either of them in writing the 2016 Screenplay.  Even if it

5  could be argued the pre-existing screenplays are some sort of compilation of Mr.

6  Boorman's writing, Mr. Kormarnicki's writing, and Mr. Safinia's writing while he

7  was engaged by Airborne, his selection of elements from those pre-existing pieces

8  would itself be protectable under copyright.  *Metcalf v. Bochco*, 294 F.3d 1069,

9  1074 (9th Cir. 2002) ("The particular sequence in which an author strings a

10  significant number of unprotectable elements can itself be a protectable element.").

11  There is nothing misleading about Mr. Safinia's registration.

12  VII.   <u>DEFENDANTS ARE NOT CO-AUTHORS</u>

13       Section 101 of the 1976 Copyright Act defines "joint work" as "a work

14  prepared by two or more authors with the intention that their contributions be

15  merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C.

16  § 101.  Each author must make "an independently copyrightable contribution."

17  *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir. 1990).  The Ninth Circuit

18  examines a three factors to assess joint authorship:

19       First, we determine whether the "putative coauthors ma[de] objective
20       manifestations of a shared intent to be coauthors."  A contract
         evidencing intent to be or not to be coauthors is dispositive.  Second,
21       we determine whether the alleged author superintended the work by
22       exercising control.  Control will often be the most important factor.
         Third, we analyze whether "the audience appeal of the work" can be
23       attributed to both authors, and whether "the share of each in its success
24       cannot be appraised."

25  *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.,* 531 F.3d 962 (9th Cir. 2008)

26  (citations omitted).

27       To be an author, one needs to write something.  Defendants did not write a

28  single sentence of the 2016 Screenplay.  SGD 27; Safinia Decl. ¶7.  There are no

-20-

"contributions" to merged here.  There exists no evidence suggesting Mr. Safinia and Defendants "intended" to co-author the 2016 Screenplay, either.  *See generally* Chartier Decl., Exhs. A, B; Austin Decl., Exhs. A-Q.  No evidence exists suggesting Defendants "superintended" the 2016 Screenplay's writing by "exercising control," other than the fact Defendants asked Mr. Safinia for a screenplay that was shorter than the then-existing screenplays.  SGD 20; Safinia Decl., Exh. B.  And since the 2016 Screenplay was not itself released to the public, "the audience appeal of the work" factor does not help Defendants, either.  The foregoing factors make an even stronger case for Messrs. Boorman and Kormarnicki not being co-authors.  Mr. Safinia had never met or spoken to them.  SGD 28; Safinia Decl. ¶7.  Thus, all three factors from *Richlin*, *supra*, militate against co-authorship: no intent to co-author exists, Messrs. Boorman and Kormarnicki did not superintend Mr. Safinia's work, and there is no audience appeal to attribute.

## VIII.   MR. SAFINIA DID NOT INTEND TO ALLOW DEFENDANTS TO A USE HIS SCREENPLAY WITHOUT HIS INVOLVEMENT

In this case, no agreement for Mr. Safinia's writing services or directing services was ever signed.  SGD 84; Safinia Decl. ¶¶13, 15, 17.  Mr. Safinia and Defendants did not sign a written agreement selling the 2016 Screenplay outright to Defendants, either.  SGD 84; Safinia Decl. ¶17.  Instead, what we have are negotiations that fell apart.  SGD 48-70; Dern Decl. ¶5 & Exhs. A-D.  In situations like this, granting an implied license is improper:

> In the context of both copyrights and patents, circumstances giving rise to an implied license are *exceedingly narrow*.  [….]  The parties negotiated for a real license but the talks collapsed and no license was given.  *It would be most bizarre to somehow find an implied license in this scenario*.

*Oracle America, Inc. v. Google Inc*., 2012 WL 1965778, at *1 (N.D. Cal. May 31, 2012) (Alsup, J.) (emphasis added).  To grant an implied license in this case would be even more bizarre.  Mr. Safinia manifested his objective intent ***not*** to grant an

implied license by repeatedly telling Defendants they had no right to the 2016 Screenplay until they concluded and sign a written agreement with him.  SGD 64, 65, 68, 70, 78; Safinia Decl. ¶¶13, 15, 17; Dern Decl., Exhs. A-C.

Defendants' claim "every objective fact" supports a finding of an implied license likewise lacks merit, and relies on a misapplication of Ninth Circuit law. Defendants rely on *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990), and the three element test it sets forth to argue for an implied license.  Mem. at 26-27.  But the Ninth Circuit later clarified the test in *Effects* applies only where there is a sale between a buyer and seller: "*Effects Associates* stands for the principle that a seller grants a buyer an implied license to use a product for the purpose for which the seller sold it to the buyer."  *Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821, 827 n.10 (9th Cir. 2001).  That is not the case, here:  Mr. Safinia did not sell a product to Defendants.

Even if the reasoning of *Effects* could apply, the facts there do not resemble the ones here.  In that case, "Effects's copyright registration certificate state[d] that the footage is to be used in 'The Stuff,' so does the letter agreement of October 29, 1984, and Effects's President James Danforth agreed at his deposition that this was his understanding."  908 F.2d at 558. n.6.  It was those factual findings – along with the plaintiff's acceptance of $56,000 – that led the Ninth Circuit to conclude "Effects created a work at defendant's request and handed it over, intending that defendant copy and distribute it."  908 F.2d at 558-59.

Here, the copyright registration does not state the screenplay is intended for use by Defendants to make their film.  SGD 49, 50: Safinia Decl., Exh. C.  There is no written agreement between Mr. Safinia, on the one hand, and Defendants, on the other.  SGD 97; Safinia Decl. ¶¶13, 15, 17.  And Mr. Safinia never accepted any payment here; in fact, he directed the funds be returned to Defendants.  SGD 85-86; Safinia Decl. ¶15.

1    *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008), does

2    not help Defendants, either.  In that case, the Ninth Circuit looked at the relationship

3    between the parties, executed agreements between the parties, unexecuted

4    agreements between the parties, as well as payments received by the plaintiff to

5    conclude the plaintiff intended to grant a license to use his work without his future

6    involvement. 542 F.3d at 756-57.  Here, the opposite is true: the draft agreements

7    show Mr. Safinia and Defendants intended Mr. Safinia not just rewrite a screenplay,

8    but also put together a version of the film from footage shot at his direction.  SGD

9    57, 61; Dern Decl., Exhs. A-C.  In other words, Mr. Safinia did not intend to allow

10   Defendants to make a film using his screenplay without his involvement.

11       Finally, even if the Court finds an implied license exists, the scope of such

12   license, whether Defendants exceeded the scope of the license, and whether Mr.

13   Safinia validly terminated such license all present issues of triable fact precluding

14   summary judgment.  *Crispin v. Christian Audigier, Inc*., 839 F.Supp. 2d 1086, 1094

15   (C.D. Cal. 2011) (conflicting evidence as to scope of implied license precluded

16   summary judgment); *Irwin v. American Interactive Media, Inc*., 1994 WL 394979,

17   at *6 (C.D. Cal. Apr. 14, 1994) (conflicting evidence "created a triable issue of fact

18   as to whether Defendants' failure to pay (until Plaintiff sent the revocation letter)

19   constituted a material breach of the license entitling Plaintiff to revocation and

20   damages for copyright infringement for further use thereafter").  Indeed, if

21   Defendants exceed the scope of the license, Mr. Safinia is entitled to revoke it and

22   sue for copyright infringement.  *Rano v. Sipa Press, Inc*., 987 F.2d 580, 586 (9th

23   Cir. 1993); *Irwin*, 1994 WL 394979, at *6.

24       Defendants present no evidence from which to glean the scope of the license,

25   much less to glean whether they stayed within that scope.  SGD 95; *see generally*

26   Chartier Decl. ¶¶1-8 & Exhs. A, B.  But they bear the burden on proving this

27   affirmative defense at trial, and here on this motion.  *Worldwide Church of God v.*

28   *Philadelphia Church of God, Inc*., 227 F.3d 1110, 1114 (9th Cir. 2000) (existence of

a license is an affirmative defense and the burden of proof is ultimately on the party seeking to avoid infringement liability).  For his part, Mr. Safinia avers he would not have licensed Defendants to use his 2016 Screenplay to make a film in which was not shot, in part, on location at Oxford University.  SGD 95; Safinia Decl. ¶17.  He further would not have licensed the Defendants to use his 2016 Screenplay to make a film in which he did not play a part in the final assemblage.  SGD 95; Safinia Decl. ¶17.  These averments, in the face of no contrary evidence – or any evidence, really – create triable issues as to the scope of the license and whether Defendants exceeded it, thus providing another ground to deny summary judgement.

IX.   <u>MR, SAFINIA WILL PRESENT EVIDENCE PROVING COPYING</u>

Mr. Safinia was on set during the shooting of the Film.  SGD 74; Safinia Decl. ¶14.  He avers the film was shot using his 2016 Screenplay.  SGD 74; Safinia Decl. ¶14.  Bruce Davey, a non-party, also avers he was on set, and that Defendants shot their film using Mr. Safinia's 2016 Screenplay.  SGD 74; Davey Decl. ¶3.  Even Defendants' own employee, Dominic Rustam, testified in deposition the only screenplay used was Mr. Safinia's 2016 Screenplay.  SGD 74; Perahia Decl., Exh. C (Rustam Tr.) at 39:9-40:10.  That is *direct evidence* of copying, which is all that is required to prove the claim.  It is only in the absence of "direct evidence of copying" in which "proof of infringement involves fact-based showings that the defendant had access to the plaintiff's work and that the two works are substantially similar." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000) (internal quotations omitted).

Moreover, Mr. Davey avers he saw the film Defendants cobbled together and that it copies Mr. Safinia's 2016 Screenplay.  SGD 85; Davey Decl. ¶4.  He further avers he will appear at trial and bring with him a copy of the film Defendants provided him, so that the jury may see the film and compare it to the 2016 Screenplay.  SGD 85; Davey Decl. ¶4.

In any event, if Defendants really believe their film bears no resemblance to Mr. Safinia's screenplay, they would have provided a copy for the Court to view with their moving papers – but they didn't.  It is Defendants who bear the burden on this motion, not Mr. Safinia.

Finally, on this issue of proving infringement, Defendants misrepresent the import of *Antonick v. Electronic Arts, Inc.*, 841 F.3d 1062 (9th Cir 2016).  In that case, the plaintiff did not introduce the infringing work into evidence *at trial*: "The district court was correct.  Antonick's claims rest on the contention that the source code of the Sega Madden games infringed on the source code for Apple II Madden. *But, none of the source code was in evidence.  The jury therefore could not compare the works to determine substantial similarity*."  841 F.3d at 1066 (emphasis added). Thus, the Ninth Circuit affirmed the District Court's grant of judgment as a matter of law *after* jury trial.  *Id.*  But that is not the situation here, at summary judgment, and *before* trial.  *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316 (9th Cir. 1987), also does not apply.  In that case, the district court entered summary judgment against the plaintiff after an evidentiary hearing in which the court found the plaintiff "had lost or destroyed" his original copyrighted drawings "in bad faith," and "denied admissibility of any secondary evidence" of any copyrighted drawings.  808 F.2d at 1317.  That is not the situation here, either.

## Conclusion

For the foregoing reasons, the Court should deny Defendants' motion.

DATED: October 23, 2018          QUINN EMANUEL URQUHART &
                                 SULLIVAN. LLP


                                 By: /s/ Jeffery D. McFarland
                                 Jeffery D. McFarland
                                 *Attorneys for Farhad Safinia*